SCHMIDT MANUFACTURING COMPANY OF SOUTH CAROLINA, a Corporation, Plaintiff,

v.

SHERRILL INDUSTRIES, INC., a Corporation, and Future Plastics, Inc., a Corporation, Defendants.

Civ. No. 1963.

United States District Court
W. D. North Carolina,
Charlotte Division.

Nov. 24, 1965.

James B. McMillan, Helms, Mulliss, McMillan & Johnston, Charlotte, N. C., for plaintiff.

Tom D. Efird and Joseph B. Alala, Jr., Garland & Alala, Gastonia, N. C., and Clifton T. Hunt, Jr., Greensboro, N. C., for defendants.

CRAVEN, District Judge.

## FACTS

1. The plaintiff is a South Carolina corporation, and the defendants are North Carolina corporations. The amount in controversy exceeds $10,000.-00, and the cause is within the jurisdiction of this court because of that fact and the diversity of citizenship of the parties.

2. Schmidt Manufacturing Company of South Carolina was organized at Greenville, South Carolina, about 1955. Its president is Ralph F. Schmidt. Mr. Schmidt is 42 years old, lived 27 years in New Bedford, Massachusetts, is not an engineer nor college trained. He and his family have been in the business of making textile loom accessories for many years. He moved to Greenville in 1950, bought the old Greenville Leather Belting Company, and in 1955 formed Schmidt Manufacturing Company of South Carolina to manufacture textile accessories (Schmidt deposition, 67–69). Before 1955, except for some unsuccessful experiments with plastic, the products involved in this suit had been made by various manufacturers from leather, rubber, cloth and other materials.

3. European chemists in the mid-fifties had developed polyethylene plastics to the point that they could be used at points of extreme stress, impact and friction in textile machinery. In 1957 through another family corporation, Schmidt Manufacturing Company of Massachusetts, the plaintiff acquired the rights to make and sell a special high molecular weight polyethylene plastic called "Polydur" in this country (Schmidt deposition, 13–14). "Polydur" is presently made only in green (Schmidt deposition, 17 and 20), and no company but the two Schmidt companies is authorized to distribute it or manufacture textile parts from it in the United States (Schmidt deposition, 13). The trademark "Polydur" is registered in Europe and America, but the trademark is not held by the plaintiff, and the rights the plaintiff seeks to protect are not based upon patent, trademark or copyright. (Amendment to plaintiff's complaint)

4. "Polydur" is a material which was displayed to the court in slightly varying shades within a narrow range of green color. It looks generally like green soap. It can be cut with a knife or drilled with an awl. It has a high molecular weight, which means that the molecules of which it is composed tend to be stringy and complicated and heavy, which means that fracture or disruption or disintegration of the material under stress and strain is hard to accomplish. Some of the uses in which the plaintiff pioneered this material are uses as pickers, lug straps,

harness connectors and bearings on textile looms. A picker is a type of hammer which is operated by machinery and whose function is to knock the heavy shuttle back and forth along a raceway carrying the woof, usually a single thread of yarn, across the direction of the warp, which is many threads of yarn. This is the traditional weaving process— a shuttle or bobbin passing a thread back and forth across the warp so that it passes over some threads and under other threads, and thereby weaves the two crossed threads together into a sheet of cloth. The shuttle may weigh close to two pounds. It has a sharp metal point on each end. The picker head hits this sharp metal point from about sixty to upwards of one hundred times a minute. Only materials of great durability and resiliency can withstand this type of impact for very many days of time. Testimony and other information by Mr. Schmidt indicated that when "Polydur" was introduced to the weaving trade the "Polydur" pickers, always green, lasted many months on looms where the previous types of pickers had lasted only days or weeks. "Polydur" also has high tensile strength and withstands repeated pulls or stretching actions in a way far superior to previous materials. The use of the material in lug straps (a lug strap exerts a pull on the picker handle in order to make the picker head hit the shuttle) has been a spectacular success. Lug straps installed at Springs Mills four and five years ago are still running on looms where straps of the original material would only last a few months or less. Evidence was introduced by both sides on the question of the quality of the plaintiff's product, "Polydur" and the defendant's product, "Hi-Moly". There was testimony as to molecular weight and as to durability of the two products. While the testimony is conflicting on this subject, the only testimony offered by graduate engineers tends to show that the molecular weight of "Polydur" is higher than that of "Hi-Moly". See the reports of Dr. Myer Ezrin (Exhibits 2004, 2005 and 2006) and Dr. Hertlein (Exhibit 2015). The exact molecular weight of these products is not really a critical issue before the court except as it bears upon the issue of misrepresentation by the defendants. The defendants put the name "Hi-Moly" on Nylon, which is not a polyethylene plastic at all, and on another material which they call ABS Polyner which is not high molecular weight polyethylene plastic. But defendants' high impact and stress loom room parts (such as pickers) *are* made of high molecular weight polyethylene plastic. The plaintiff has consistently used one source, one trade name, one color, one supplier and one manufacturing process—that of Leder & Company in Switzerland, while the defendants have in the past used materials of many colors, many manufacturers, American and European, many molecular weights, many specifications, and many manufacturing processes, including molding. The breaking strength of the two products (reports of Dr. Ezrin and Dr. Hertlein) are different; the fusing characteristics are different; even so, it is correct to say that both plastics are high molecular weight polyethylene. *Neither* trademark ("Polydur" and "Hi-Moly") specifies composition of material.

5. Over a period of six years, from 1957 until 1963, the plaintiff was the sole merchandiser to the weave room industry of *green* high molecular weight polyethylene plastic loom parts. One former employee of Burlington Industries set up in a Reidsville garage as "Tri-Cities Company" and started making some loom parts of "Polydur", but when Schmidt was informed of this he complained to Leder & Company, and Leder & Company arranged to discontinue the infringement of Schmidt's exclusive American rights. The green product was introduced to a textile weaving industry suspicious of plastics because of previous failures with plastics. Schmidt was able to get into the large Burlington Industries weaving departments by going to the weave room overseers and fixers and persuading them to try a few "Polydur" parts, keep records on their performance, and to pass

the word back up the line to the mill superintendents and eventually to the central purchasing authorities. Acceptance was slow, but when the test reports began to reach the purchasing departments the Schmidt product began to sell, and Schmidt acquired a substantial portion of the market for textile weave room accessories.

It is found from the lengthy deposition of Turner Bilisoly, purchasing agent for the largest weaver in the world; from the deposition of Mr. Stroble of the Graniteville Company; from the testimony of Ralph Schmidt and John Cook of *Textile Industries*; and from the testimony of Richard E. Davis and James Wheelus, that the choice of loom parts is influenced by the judgments and the opinions of the mechanics (fixers) and overseers in the weave rooms. The testing programs described by the defendants' witness, Stroble, and by the plaintiff's witness, Bilisoly, are identical at Burlington and Graniteville. The salesman leaves parts with the weave room overseer or suprintendent, and the fixers try them out on the looms, and if they work the purchasing department eventually learns about it and eventually buys the parts the fixers and overseers like. This is less true now than when the loom products were first introduced. It is also clear from the testimony of Davis and Schmidt and others that the color of plastic loom accessories was the immediate and easy means of identifying the parts of a particular manufacturer in the minds of the fixers and overseers, and that fixers sometimes call for parts by color; that they like or dislike them by color; and that color has an association in the minds of these people when it comes to determining the quality and performance of loom accessories. When there was only *one* manufacturer using the color green, fixers, if they liked the product and wanted more of the same, need only ask for green and not burden their memories with "Schmidt" or Polydur". Naturally, they did so to some considerable extent—without even remembering the name of the trademark or manufacturer. Rather than meaning "Schmidt", green simply meant to fixers a good, long-lasting part.

As bearing upon the scope of the claims made by the plaintiff for protection, the following detailed facts are found:

(a) Green is the only color the plaintiff had ever employed on high molecular weight polyethylene plastic.

(b) Over a period of six years none of the other fifteen or so manufacturers had employed green in the manufacture of loom accessories of high molecular weight polyethylene plastic (except for the brief Tri-Cities operation mentioned above).

(c) Other colors have an association with other manufacturers:

Golden yellow is the color of Dayton.

Red is the color of the German manufacturer, Haag.

White is a color of Garland.

Yellow is used by several companies (T42–T45).

(d) Between 1960 and 1963 the defendants had manufactured loom accessories of numerous colors other than green. These colors included White, gray, black, red, purple, blue, brown, tan, yellow and pink.

(e) The plaintiff makes no claims of a secondary meaning in any use outside the weave rooms and on the looms themselves. Other mill departments and other industries are not included in the claims of the plaintiff.

6. The identification of the plaintiff's green plastic was not an accidnt. It was the result of the quality of the product and of hard work by the plaintiff over many years, which included:

(a) Personal selling with the fixers and overseers and purchasing departments of mills.

(b) Overcoming previous resistance to previous unsatisfactory plastic.

(c) Exclusive use of the color green which the witness John Cook said did not look like a good color at the beginning, but turned out to be a good color because the plaintiff made sales with it and the product was good.

(d) A record of action by the plaintiff to prevent others (Tri-Cities) from imitation.

(e) Advertisement through the use of green in catalogs and hand-bills.

(f) Advertisement through the use of green on shipping cartons.

(g) Advertisement through displays in airports.

(h) Advertisement through displays at every textile show starting with 1960 (the defendants have only advertised green products at one textile show—the Greenville show in 1964; the defendants did not display green at Atlantic City in 1965).

(i) The use of green in word-of-mouth advertising and discussion with customers as a distinctive identifying trait.

(j) The use of green in letter-heads.

(k) Green advertising in textile magazines.

7. The identification of green with Schmidt Manufacturing Company is illustrated by numerous plaintiff's exhibits, including the various advertisements, catalog pages and other items in GROUP A of the plaintiff's exhibits, and in the numerous purchase orders going back at least as far as 1960, beginning at which time numerous customers were identifying the plaintiff's products by the color green, but also, in most instances, specifying "Polydur".

8. It is found from the advertising, from the trade show displays, from the testimony of the plaintiff and from the testimony of John Cook, editor of TEXTILE INDUSTRIES, a leading textile publication, that Schmidt's green plastic for weave room parts had become well and widely known in the textile trade and that the Schmidt product had a good reputation.

9. The defendant Future Plastics, Inc. was organized in 1960 and started manufacturing loom accessories of various materials, including high molecular weight polyethylene plastic. They called these materials "Hi-Moly", which is a registered trademark. They have used the name on various materials, but mostly on high molecular weight loom parts. According to the evidence (for example, the answer to plaintiff's Interrogatory No. 13), the defendants have obtained their plastic material from at least seventeen different American and European sources, and now manufacture most of it themselves from raw powder.

10. The record shows the defendants have used all of the colors which were in use or had been used by all the other manufacturers in the field before they finally elected to concentrate their entire production into the color green. These colors included white, yellow, red, purple, blue, brown, pink, and tan or beige, and possibly others. The defendants' first order of green material was $40.70 worth of green material ordered from a German chemical company on December 28, 1962, (see the shipping confirmation from Hostachem Corporation which was identified with Defendants' Exhibit 1051 and is dated December 28, 1962). Throughout the spring and summer of 1963 the defendants conducted experiments in various colors and various plastics from various manufacturers. Among the materials undergoing tests as late as July 1963 was "green Polydur". (See ordering samples of green coloring from chemical suppliers (Defendants' Exhibit 1009–C).) At some time during 1963 they began the production of some items of high molecular weight plastic in the color green for loom accessories, and eventually their entire production of these items, except for special orders, was shifted to green.

11. Paul Bruchon, an officer of both defendants and affiliated with one of the defendants since 1956, was a resident

of Greenville, South Carolina, from 1956 to 1962. He was in and out of the plaintiff's office "many, many times" according to his own testimony. He was one of those who participated in the decision to start making "Hi-Moly" loom parts in a green color which is substantially identical in shade and appearance to the green color Schmidt had previously been using on "Polydur" loom parts. Mr. Bruchon knew plaintiff's color for its parts was green and always had been. So did the other officers of defendants who made the decision to switch to green.

12. Defendants contend that they switched from the other colors used by them, notably pink, to green alone because of customer demand. The evidence shows that they had a request from Marion Manufacturing Company for green lug straps and a stated preference from Springs Mills that they switch from yellow "to green or some other color". Certainly the customers actually requesting a switch of color constituted a very small percentage of defendants' market.

The defendants also offer the explanation that they shifted to green because it is the dominant color in textile weave rooms and that most looms are painted green.

Neither explanation is very persuasive. Most business decisions are based on composite factors, and undoubtedly the preference of Marion Manufacturing Company and Springs Mills entered into the decision, as did also the fact that most looms are painted green. But a more important reason for switching to green, it seems to me, (and I find as a fact that defendants were dominantly motivated by this reason) is that fixers and workers in loom rooms sometimes ask purchasing agents to buy more "green" pickers and other loom parts, meaning only to convey to the purchasing agent a desire that long-lasting parts (made of high molecular weight polyethylene) be purchased. Unsophisticated persons in the mills have undoubtedly, to some considerable extent, become well satisfied with Schmidt's product without even knowing the name of it ("Polydur") or even the name of Schmidt. They were asking for geen parts—not because they wanted Schmidt's "Polydur"—but because they were satisfied with the lasting qualities of high molecular weight polyethylene. I think the dominant reason for switching to green was the wish of defendants to make it necessary for customers to look at the trademarks and become aware of source of manufacture—rather than simply sticking to a color which had proved satisfactory over a period of several years.

Defendants truthfully represented to the trade that their high molecular weight polyethylene parts were "the same" in that respect as plaintiff's. Yet some unsophisticated purchasers, and especially fixers who influence purchasing, apparently could not or would not believe that long-lasting high molecular weight polyethylene came in any color but green. This false impression arose partly from plaintiff's success with its green product, and partly because of the bad experience the industry had had with lighter weight plastics in all the colors of the rainbow.

I find as a fact that defendants consciously imitated the green color used by plaintiff—not for the purpose of making a purchaser think that they were buying plaintiff's product, but for the purpose of making purchasers think that they were getting high molecular weight polyethylene—which they were—and to require buyers to buy by trademark rather than by color.

There has been some confusion in the minds of customers as a result of the switch to the green color. Some customers have ordered green "Polydur" from Sherrill and green "Hi-Moly" from Schmidt, but the point is that the trademarks have generally been used. What confusion has occurred has been *after* purchase. No customer has apparently bought Sherrill's product thinking he was getting Schmidt's. There has been no palming off. After using the part, after wearing off the trademark, customers have sometimes forgotten which product

they had bought, and complained to the wrong source.

Sherrill's imitation of the Schmidt color green means that fixers can no longer identify Schmidt's product by color, but must specify "Schmidt" or "Polydur" in requisitions if it is Schmidt's product they prefer. Some customers appear to be indifferent as between the products so long as they are made of high molecular polyethylene and last.

Schmidt's products are of a heavier molecular weight than Sherrill's and cost a little more. But both are of high molecular weight polyethylene. Both are long lasting, and the difference of strength and lasting quality is perhaps no greater than the price differential.

13. The plaintiff has not been able to demonstrate any precise amount or volume of business which has been lost because of the competition of the defendants. Perhaps in the nature of things it would be hard ever to show this directly because a purchasing agent who claims some sophistication would not ordinarily be expected to say that he had bought a particular loom part because it was green instead of because of its other merits. There has been some slowdown in the rate at which Schmidt was increasing its sales, although they are still increasing. Many former customers of Schmidt are buying from Sherrill since Sherrill switched to green—but this was true before the switch.

CONCLUSIONS OF LAW
AND
MEMORANDUM OF DECISION

■■ In a diversity case, a federal court sits as another forum of the state, and is bound to apply state law, including the state law of conflicts. Since both plaintiff and defendants are engaged in sales on a national scope, there is some difficulty at the outset in ascertaining the law to be applied. But since both plaintiff and defendants sell in North Carolina, it is reasonably clear that the law of North Carolina would

apply to those sales—subject, however, to controlling federal law, if any. See Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 at 667 (1964). The question of conflicts, however, can be passed over, because assuming, without deciding, that North Carolina law applies, the plaintiff is not entitled to prevent defendants from using the color green.

Insisting that North Carolina law governs, plaintiff relies heavily upon Yellow Cab Co. v. Creasman, 185 N.C. 551, 117 S.E. 787, 28 A.L.R. 109 (1923). In that case Creasman had operated taxicabs in Asheville for ten or twelve years—always painting his cabs a gray or black color. He was asked to inaugurate a Yellow Cab taxi service in the city, but declined to do so. Thereafter, when hurt by Yellow Cab Company competition, Creasman copied the colors of yellow and black on his cabs, using almost exactly the same shade of yellow, in close imitation of the cabs of Yellow Cab Company. The imitation was close enough to mislead and deceive the general public into believing that the cabs of Creasman were the cabs of Yellow Cab Company. Certain patrons of the Yellow Cab Company were deceived.

The matter came before the Supreme Court of North Carolina, not on the merits, but on denial of motion for a preliminary injunction. All that the court held is that it is not impossible for a secondary meaning to be acquired in a color so as to justify and support the issuance of a preliminary injunction.

Yellow Cab Company v. Creasman, supra, comes close, but does not quite fit the case now before me. There are several distinctions:

(a) In Yellow Cab, actual intending patrons were deceived and took a Creasman cab thinking it was a Yellow Cab. No purchaser of Sherrill's products thought they were buying Schmidt's products.

(b) An intending patron of a yellow cab, hailing it at some distance, cannot possibly tell one yellow

cab from another. An intending purchaser of loom parts *can* tell one product from another by (1) trademark on it and/or (2) by package labeling.

(c) Yellow Cab was concerned with use of a color in one county. Schmidt's and Sherrill's products are sold nationally.

(d) Yellow Cab was not decided on the merits but on a preliminary motion.

Yellow Cab does not hold that the Yellow Cab Company was entitled to stop Creasman from using the yellow and black colors: the court's opinion is equally consistent with the possible remedy that Creasman be required to paint his name on his yellow and black cab with enough prominence to prevent confusion. Yellow Cab Company v. Creasman, supra, does not hold that the plaintiff was entitled to the exclusive use of a color, but only that the facts were sufficient to require that the preliminary restraining order be continued to the hearing.

■ Plaintiff insists that it acquired by advertising and long usage a secondary meaning in the color green. I fail and refuse to so conclude. "(A) secondary meaning exists when, in addition to their literal, or dictionary, meaning, words connote to the public a product *from a unique source*." Charcoal Steak House of Charlotte v. Staley, 263 N.C. 199, 139 S.E.2d 185, 187 (1964). To establish a secondary meaning, a plaintiff "must show that the primary significance of the term (color) in the minds of the consuming public is *not* the *product* but the *producer*." Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73, 78 (1938).

■ Green never meant Schmidt Manufacturing Company of South Carolina to the users of plastic loom parts. Instead, green came to mean to the unsophisticated user, mostly fixers, simply a long-lasting, remarkably tough and strong impact-resistant plastic material. That this is true is demonstrated by the very value placed by plaintiff on the color green: if fixers could or would remember "Polydur" or Schmidt, then color would be of no consequence. Some purchasing agents for the mills did undoubtedly associate green with Schmidt. When requested by the fixer to get some more green parts, such an agent sent orders in to Schmidt—usually specifying "Polydur—green". But the real meaning of green—to fixer *and* purchasing agent—was a particular high molecular weight polyethylene—not the manufactured products of Schmidt. And that material was protected by trademark ("Polydur") with respect to use in loom rooms. The protection afforded a trademark is limited to the mark and cannot be extended by the exclusive appropriation of a color.

■ Even if it be assumed that green acquired "secondary significance" as to Schmidt, it does not follow that plaintiff would be entitled to exclusively use the color green. A competitor may copy design or color if he accompanies its use with something which will adequately show that the first person or his product is not meant. Charcoal Steak House of Charlotte, Inc. v. Staley, 129 S.E.2d at 188. This the defendants have already done. Defendants mark their products with the trademark "Hi-Moly", and their packages are marked either Sherrill Industries or Future Plastics.

■ Unfair competition is the child of confusion, and the confusion must occur at time of purchase and relate to that being purchased—not to something used in the past. There is no evidence that anyone ever bought a plastic part from Sherrill or Future Plastics thinking it to have been manufactured by Schmidt. Confusion that occurs *after* purchase, i. e., when the purchaser cannot remember the source of his purchase, is an irrelevancy under the law of unfair competition. If a customer erroneously thinks he has been satisfactorily using Sherrill's products when in fact he has been using Schmidt's, and sends a purchase order to Sherrill, the result is not

palming off. Compco Corp. v. Day-Brite Lighting, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 at 672 (1964). Mere inability of the public to tell two identical articles apart is not enough to support an injunction against copying. Sears, Roebuck & Co. v. Stiffel Co., supra, 376 U.S. at 232, 84 S.Ct. 789, 11 L.Ed.2d at 667. That Schmidt may have originated the use of green high molecular weight polyethylene parts in loom rooms and made it popular is immaterial. Sharing in the good will of a new material which one is entitled to use (unprotected by patent or trademark) is the exercise of a right possessed by all who have the right to use the material—and in the free exercise of which the consuming public is deeply interested. Kellogg Co. v. National Biscuit Co., supra, 305 U.S. at 122, 59 S.Ct. at 115, 83 L.Ed. at 80; Sears, Roebuck & Co. v. Stiffel Co., supra, 376 U.S. at 231, 84 S.Ct. at 789, 11 L.Ed.2d at 667.

In Kellogg, the Court noted that the copier was undoubtedly sharing in the good will of the article and thus sharing in a market which was created by the skill and judgment of the plaintiff and which had been widely extended by vast expenditures in advertising persistently made. Then the Court said: "But that is not unfair."

It is not unfair here, within the meaning of the law of unfair competition, that defendants copied plaintiff's use of the color green.

Plaintiff is entitled to require of defendants only that which they are already doing: identification of their products by application of trademark "Hi-Moly", where feasible, and by prominently labeling packaging of products that cannot be marked, or both.

In any event, plaintiff's evidence as to damages is insufficient to support a monetary award.

An appropriate judgment will be entered dismissing the complaint.