**FUNNELCAP, INC., Plaintiff,**

v.

**ORION INDUSTRIES, INC., and Cal Custom Accessories, Inc., Defendants.**

**CAL CUSTOM ACCESSORIES, INC., and Orion Industries, Inc., Plaintiffs,**

v.

**FUNNELCAP, INC., Defendant.**

**Civ. A. Nos. 74–217, 75–174.**

United States District Court, D. Delaware.

Sept. 1, 1976.

See also, D.C., 392 F.Supp. 938.

John G. Mulford, Theisen, Lank & Mulford, Wilmington, Del., for FunnelcaP, Inc.; Berton Scott Sheppard, Wolfe, Hubbard, Leydig, Voit & Osann, Ltd., Chicago, Ill., of counsel.

Paul E. Crawford of Connolly, Bove & Lodge, Wilmington, Del., for Cal Custom Accessories, Inc. and Orion Industries, Inc.; Vern Schooley of Fulwider, Patton, Rieber, Lee & Utecht, Long Beach, Cal., of counsel.

STAPLETON, District Judge:

These consolidated actions present issues of patent and unfair competition law. In Civil Action No. 74–217, which was originally filed in Delaware, FunnelcaP, Inc. ("FunnelcaP") asserts four affirmative claims of wrongdoing against Orion Industries, Inc. ("Orion") and Cal Custom Accessories, Inc. ("Cal Custom"). In Civil Action No. 75–174, which was originally filed in California, Orion and Cal Custom assert four corresponding claims for declarations of non-liability to FunnelcaP.[1] These four affirmative and defensive claims have been tried to the Court and the following represents the Court's findings of fact and conclusions of law after trial.[2]

This Court has jurisdiction over FunnelcaP's patent claim pursuant to 28 U.S.C. § 1338(a), and jurisdiction of its unfair competition claim pursuant to 28 U.S.C. § 1338(b). There is also diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) since FunnelcaP is a Massachusetts corporation, with its principal place of business in that state, and Orion and Cal Custom are Delaware corporations with their principal places of business in California.

This controversy centers around a device known under plaintiff's designation as a "FunnelcaP". This device, which represents the preferred embodiment of the claim of the patent-in-suit, is designed to snap onto the top of standard-size cans and to serve as a pouring and storage device, being particularly useful in situations where the entire contents of the can are not to be disposed of at once. For example, if the user desires to dispense only half a can of motor oil, he can attach a "FunnelcaP" (see Figure 1 in the Appendix to this Opinion), pour out the amount desired, and store the remainder without contamination by applying the closure element to the spout of the funnel portion of the device. Among other things, plaintiff's funnel device fea-

---

1. C.A. No. 75–174 also asserts invalidity of the patent-in-suit on various grounds. Eight additional causes of action for affirmative relief for trade libel, libel, inducing breach of contract and interference with prospective advantage originally pressed by Orion and Cal Custom were voluntarily dismissed on the opening day of trial.

2. Hereafter, the issues shall be treated as if posed in one suit with FunnelcaP as plaintiff.

tures an off-set neck to facilitate pouring in confined spaces. In addition, plaintiff's device can be removed from the tops of cans merely by applying finger pressure to the inclined surface of the funnel.

This device was first developed by a gentleman named Roger Nowak, working out of his home in West Boylston, Massachusetts. Although the patent for the device was not obtained until August 7, 1973, sale was begun in 1970 under the name WRN Industries, with Barbara Wyatt, Mr. Nowak's daughter, serving as marketing manager. Of the utility and commercial success of plaintiff's device, there can be no doubt. Sales totaled 20,000 in 1970, over 200,000 in 1971, and, in 1972, over 1,000,000 were sold by WRN Industries. During this time, one of WRN's principal customers was Western Auto Supply Company.[3]

In 1973, Barbara Wyatt and her husband, Peter, incorporated FunnelcaP, Inc. and acquired the funnel business, including all right, title and interest in the Nowak patent, from Mr. Nowak and WRN Industries. Also in 1973, an entity known as Hollywood Accessories ("Hollywood"), which has been at various times a division of Orion and Cal Custom—the defendants herein—began to market funnel devices similar to FunnelcaP's and to negotiate with Western Auto for its business. These negotiations proved successful; Western Auto dropped FunnelcaP as a supplier in February of 1974. This lawsuit followed.

## I. PATENT INFRINGEMENT AND VALIDITY.

### A. *Infringement.*

The Nowak patent contains but one claim, reading as follows:

1. A funnel, for use on a container, said container having a circular upper surface, a container flange upwardly directed from the periphery of the upper surface, and a container lip extending radially from the upper edge of the container flange, comprising:

a. A first circular aperture, defining a plane, and having an axis and a circumference,

b. a second aperture of smaller area than said first aperture, and having a periphery and a geometric center, said second aperture being spaced from the plane of the first aperture and located so that its center is spaced from the axis of the first aperture,

c. a elastomer plastic web connecting every point on the periphery of the second aperture to every point on the circumference of the first aperture,

d. a first flange, concentric with the first aperture and extending longitudinally from the plane, and positioned to engage the inner surface of the container flange,

e. a second flange, of large (sic) diameter than and concentric to the first flange, and extend (sic) longitudinally from the plane,

f. a peripheral, inwardly-directed lip extending radially from the second flange, and positioned to engage the lower portion of the container lip thereby cooperating with the first flange to form a seal with the periphery of the container.[4]

Figure 2 of the Appendix is a cross-sectional drawing of the preferred embodiment of the patent claim upon which the Court has indicated the elements corresponding to the various subparagraphs of the claim. As will be noted, there is no one element depicted as corresponding to subsection d of the patent claim; rather, two elements are indicated, $d_1$ and $d_2$. As will later appear, this has been done because the parties are in disagreement over which element of the embodiment corresponds to claim element d.

Turning to the alleged infringing devices, it is clear that they were designed to per-

---

**3.** In 1972 and 1973, Western bought "hundreds of thousands" of the devices. Plaintiff's Trial Exhibit (hereafter "PX") G, p. 10; Transcript of Trial Proceedings ("T"), Doc. No. 77, at 119.

**4.** PX 80A.

form the same function as plaintiff's product. There is no need to describe Hollywood's first funnel product, its original No. 22 Snap-On Oil Can Funnel, in detail. It has elements which correspond exactly to claim elements a through f of the Nowak patent (however claim element d is construed), as witnesses for both parties testified.[5] Accordingly, Hollywood's original product literally infringes the Nowak patent, if the latter is valid.

This particular No. 22 funnel was not the only device ever produced by Hollywood, however, which arguably infringed the patent-in-suit. Hollywood had not been in the funnel business very long when it discovered that its original model would not fit certain types of oil cans properly.[6] This problem led Hollywood to make two changes in its design. The first, of no particular relevance here, was the use of medium-density, rather than high density, plastic. The second change, of substantial relevance, was the redesign of what has been referred to by the parties as the "flange area".[7] A magnified cross-sectional view of the "flange area" of Hollywood's redesigned product is attached as Figure 3.

As can be seen, the principal difference between the flange area of the redesigned Hollywood device and the flange area of the Nowak preferred embodiment is that, in the Hollywood version, the element denoted as $d_1$ in the drawing of the Nowak device is missing. Defendants contend that the element marked $d_1$ corresponds to element d of the claim of the Nowak patent—i. e., it is the "first flange . . . extending from the plane, and positioned to engage the inner surface of the container flange". According to defendants, then, the absence of this element in the Hollywood redesign precludes infringement. Plaintiff, on the other hand, argues that the element $d_1$ does not correspond to claim element d which, they say, is represented in the drawing by element $d_2$.[8] In any event, plaintiff argues, the omission of the element $d_1$ is without particular consequence to the overall functioning of the funnel device and, thus, the Hollywood redesign is an "equivalent" of the patented device.

Taking the former claim first, I find that the language of claim element d describes drawing element $d_1$ and cannot be reasonably said to describe drawing element $d_2$. To begin with, the physical element described in claim element d is one which extends "longitudinally from [a] plane", the plane in question being one defined by the larger of the two apertures of the funnel. This plane is horizontal as the preferred embodiment is depicted in the patent and, since the claim says the flange *extends from the plane* rather than extends *in* the plane or is situated *in* the plane, it is more natural to read claim element d as a description of a vertically projecting element.

To the extent that the language of claim element d leaves room for doubt, there is scarcely any doubt when claim element e is considered. That element also describes a flange extending "longitudinally from the plane" and this flange is conceded by plaintiff to correspond to lettered element e in the drawing of the Nowak preferred embodiment.[9] Given these facts, an application of claim element d to an element perpendicular to drawing element e, rather

5. See testimony of Roger Nowak, T. 58–9, PX. 23; testimony of Robert Comstock, T. 274.

6. Dep. of William Hyatt, PX A, at 16. As explained at trial, there are three basic types of oil cans, those made of metal, those made of a cardboard-like fibre material and those made of a plastic-type synthetic material. The upper ends of these various types of cans differ slightly in diameter. T. 26.

7. *Id.* at 29; P.T.O. p. 8; Dep. of Donald J. Shanklin, PX D, at 24.

8. Under plaintiff's theory, $d_1$ constitutes a "skirt extension" to the "flange" $d_2$. See, e. g., T. 98.

9. At trial, Mr. Nowak, in testifying for plaintiff, placed arrows on a drawing of Hollywood's redesigned funnel to indicate the points of infringement. A line said to represent claim element e was drawn to the portion of the Hollywood redesign device corresponding to that part of the Nowak drawing which I have marked with the letter e. PX 124A.

than to the downwardly-projecting element $d_1$ parallel to it, would be unnatural.[10]

Finally, the specification of the Nowak patent confirms this interpretation of its claim. In that specification, the elements of cross-sectional drawing of the preferred embodiment of the patented device were numbered as in Figure 4. The description in this specification of the elements numbered 13 and 21 is as follows:

The flange *13* extends from the main body *11* around the periphery of the opening *12*, the flange being adapted to envelope the end of a container *14*. . .

\* \* \* \* \* \*

In addition a downwardly directed axial flange *21* extends downwardly from the interior of the main body in a position generally spaced from and concentric with a flange *13*. The flange *21* fits in the inside of the lip of the container to provide for drain-back. . . .

\* \* \* \* \* \*

The funnel *10* is then snapped in place with the flange *13* fitting under the lip on the container and the flange *21* fitting down inside of the end recess of the container. . . .

\* \* \* \* \* \*

[Any liquid] will be prevented from leaking out around the edge of the funnel by the flange *21* which will ensure that this liquid returns to the recessed end of the container. . . .[11]

Claims elements d and e describe two flanges, and no other flanges are described in the claims; the foregoing excerpts from the patent specification refers to two flanges and no other flanges are elsewhere mentioned in the specification. This fact, coupled with the fact that element $d_2$ in Figure 2 is not even numbered in the drawing of the Nowak patent specification, makes it crystal clear that claim element d refers to,

and was meant to refer to, the downwardly-projecting drawing element *21*.

Giving the patent-in-suit its reasonable construction, defendants' second generation funnel does not literally infringe. Accordingly, I turn to plaintiff's equivalency argument. Comparing Hollywood's single-flange model with FunnelcaP's double-flange model, it appears that both can be attached to the top of a can and will allow pouring of the liquid or other substance contained therein through an offset funnel portion, and that these attaching and pouring functions are performed equally well by both.[12]

■ In order to constitute an equivalent, however, a device must do more than perform the same function as a patented structure; it must do so in substantially the same way as the patented structure. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

In the present case, the patent claim states that flange element d "[is] positioned to engage the inner surface of the container flange" and that, while so positioned it "cooper[ates] with [the inwardly-directed lip of flange element e] to form a seal with the periphery of the container." The patent specification further states that flange element d "fits in the inside of the lip of the container to provide for a drain-back" and that "[liquid] . . . is prevented from leaking out around the edge of the funnel by [flange element d] which will insure that . . . liquid returns to the recessed end of the container." The patented structure, therefore, as claimed and specified, performs its sealing function through the cooperation of two elements, the outer flange and lip and the inner flange. Given the positive role in the sealing function assigned to the inner flange, I do not believe plaintiff can now argue that this element is

---

10. It would also appear more natural to describe element $d_1$ as being concentric with flange e and as "positioned to engage the inner surface of the container flange" than it would be to so describe element $d_2$.

11. PX 80A, Col. 2, 11. 17–19; 41–46; 57–61; Col. 3, 11. 8–11.

12. Testimony of Bud Gibbons, President of Hollywood, T. 321.

immaterial and its deletion inconsequential. Though defendant's revised device may seal virtually as well as plaintiff's, it cannot on the record here be said to seal in the same way as plaintiff's and, accordingly, defendant's revised product is not an infringing one.

## B. *Validity.*

■ A patent is presumed valid. 35 U.S.C. § 282. A party asserting invalidity must prove his assertion "by clear and convincing proof". *Trio Process Corporation v. L. Goldstein's Sons, Inc.*, 461 F.2d 66 (3rd Cir. 1970). The defendants in this case have carried this burden.

## 1. *Anticipation.*

■ Defendants assert that three separate prior art patents disclosed the device claimed in the Nowak patent. The first of these, the Coltman patent, is entitled "Flexible Containers"[13] and is said to "relate . . . more particularly to flexible containers provided with sealable cover means."[14] In Figures 4, 5 and 6 of the Coltman specification, a "cover means" is described, a cross-section of which is shown in Appendix Figure 5. When this "cover means" is examined with the elements of the Nowak patent in mind, it is found to contain:

 a. a first circular aperture, defining a plane, and having an axis and a circumference—

namely, the aperture whose cross-sectional diameter is represented in Figure 5 by the line $a_1$–$a_2$.

 b. a second aperture of smaller area than said first aperture, and having a periphery and a geometric center, said second aperture being spaced from the plane of first aperture and located so that its center is spaced from the axis of the first aperture—

namely, the aperture formed by Coltman's pouring spout, whose cross-sectional diameter is indicated in Figure 5 by line $b_1$–$b_2$.[15]

 c. a elastomer plastic web connecting every point on the periphery of the second aperture to every point on the circumference of the first aperture—

namely, the plastic surface connecting the two above-described apertures and identified by the letter c in Figure 5.[16]

 d. a first flange, concentric with the first aperture and extending longitudinally from the plane, and positioned to engage the inner surface of the container flange—

namely, the element identified with the letter d in Figure 5.[17]

 e. a second flange, of large (sic) diameter than and concentric to the first flange, and extend (sic) longitudinally from the plane—

namely, element e in Figure 5.[18]

 f. a peripheral, inwardly-directed lip extending radially from the second flange, and positioned to engage the lower portion of the container lip thereby cooperating with the first flange to form a seal with the periphery of the container.—

namely, the element labeled f in Figure 5.[19] The device depicted in the Coltman specifi-

---

13. Pat.No. 2,754,866, issued to B. W. Coltman, Jr., July 17, 1956.

14. Defendants' Trial Exhibit ("DX") HA–01–28, Exh. 16B, Col. 1, 11. 1–3.

15. The line $b_1$–$b_2$ is identified in the drawings of the Coltman specification as element 54, and is described as an "aperture" in column 3, lines 63–68 of the patent specification.

16. This web is denominated as element 12 in the drawings of the Coltman specification and is described in column 1, lines 30–34 of the specification as being of "moldable plastic".

17. This element is labeled No. 48 by Coltman in his specification and described as an "inner flange", at column 3, lines 27–8.

18. This element is denominated with the number 14 by Coltman, and is described at column 3, line 3 of the patent specification as a "flange".

19. This element was denominated No. 46 in the Coltman specification and was described in column 3, lines 10–11 as "[a] shoulder, rib or like portion . . . provided on or adjacent flange *14* to engage the flat surface [undersurface] of bead *40* [protrusion at the upper end of

cations thus contains all of the elements a through f claimed in the Nowak patent.

FunnelcaP nevertheless urges that Coltman does not anticipate the patent-in-suit for two reasons. First, it is pointed out that the Nowak patent claim is limited in its preamble to "funnels" and it is argued that Coltman's device does not constitute such a structure. FunnelcaP takes the position that the term "funnel" necessarily connotes a conically-shaped instrument.[20] Its argument, however, ignores the fact that the device disclosed by elements a through f of the Nowak patent claim is not so limited, as the preferred embodiment depicted in the Nowak specification itself shows. It is often said, a patentee is his own lexicographer and, in this case, Mr. Nowak has defined his "funnel" as a "device comprising" claim elements a through f. Since Coltman reads on those claim elements, it cannot be said to be other than a "funnel", in the sense meant in the Nowak preamble.

FunnelcaP also argues that Coltman does not anticipate the Nowak patent because Coltman is not relevant prior art. The Nowak patent, it is argued, is limited to devices designed to be attached to cans whose lid has been pierced[21] and, since Coltman does not disclose such a container, it cannot be urged against the patent-in-suit. In my view this argument is without merit.

The problems which the Nowak device attempts to solve are pouring and storage problems, the same problems toward which the Coltman device is directed. These problems are the same irrespective of the presence or absence of an upper surface on the liquid container. I believe that the Coltman device is well within "the art to which one [could] reasonably be expected to look for a solution of the problem which the

patented device attempts to solve", *Burgess Cellulose Company v. Wood Flong Corporation*, 431 F.2d 505, 509 (2nd Cir. 1970), a view which is amply supported by the patent examiner's citation of the Wagaman patent[22] which discloses a funnel-shaped device designed for attachment to the top of a soda pop-type bottle after the cap has been removed.[23]

## 2. *Obviousness.*

35 U.S.C. § 103 provides:

[The] patent may not be obtained [al]though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which [such] subject matter pertains. . . .

Under this statute, the inventor is presumed to have knowledge of the prior art available at the time of his invention, *Application of Winslow*, 365 F.2d 1017, 1021, 53 CCPA 1574 (1966), and the test for invention thus concerns itself, not with the actual mental processes whereby the device claimed in the patent-in-suit was developed, but with the degree of difficulty in developing such a device in light of all of the prior art. Accordingly, "[under] § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined

---

the container] for the purpose of keeping this bead tightly in [the] recess *44* ".

**20.** Pl. Reply Br., Doc. No. 85, pp. 13–14.

**21.** Evidently, FunnelcaP's argument is premised on the preamble to the Nowak patent claim, which states that the "funnel" disclosed therein is "for use on a container, *said container having a circular upper surface. . . .*"

**22.** Patent No. 3,201,015 "Supplemental Container for a Bottle", R. Wagaman, August 17, 1965.

**23.** I find that the other two patents urged against Nowak—namely, Atherton and Tupper—fall somewhat short of literally anticipating. See discussion in Section 2 immediately following.

. . .". *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

As has already been indicated, I believe that the device disclosed in the Coltman patent anticipates the device claimed in the patent-in-suit. Even assuming, however, that the use in the preamble of the claimed patent-in-suit of the word "funnel" precludes literal anticipation by the Coltman device, the Nowak patent must be held obvious. The precise type of offset funnel shape contained in the Nowak preferred embodiment is disclosed in at least three patents which were already of record by the time Mr. Nowak developed his funnel device.[24] Given these disclosures, changing the Coltman device to the Nowak device would have required only the raising up of the Coltman cover into an already-disclosed shape.

Also extant at the time of the development of the Nowak device were the Atherton patent,[25] which discloses an attachment for paint cans for the purpose of pouring and mixing the contents of the can, and the Tupper patent[26] which discloses a closure for a container having a "pouring spout type of opening . . .". Each of these devices, ignoring for the moment FunnelcaP's claim that the patented device is limited to the classic conically-shaped funnel, reads on the claims of the patent-in-suit, with one minor exception in each case. The only element missing in Atherton is the inner flange, which is disclosed in both Coltman and Tupper, and the only element missing in Tupper is the radial lip on the outer flange,[27] which is disclosed in both Coltman and Atherton.

So far as the degree of difficulty of adapting either the Coltman, Atherton or Tupper devices to suit the purposes of the Nowak device is concerned, Mr. Nowak's trial testimony is instructive. Mr. Nowak was asked to specify what difficulties would be encountered by someone attempting to adapt the Tupper device to his purposes; he could identify none.[28] I see so reason for believing that adaptation of either the Coltman or Atherton devices would pose any greater problems. Accordingly, I find that the device developed by Nowak was obvious at the time developed to one ordinarily skilled in the art.

The Nowak patent is thus invalid.[29]

---

24. Such an offset funnel shape was disclosed in Patent No. 3,256,916, "Liquid Floating Device," R. W. Siletti, June 21, 1966 and in design patents 54,983, "Oil Can", F. D. Gatchell, April 27, 1920 and 60,342, "Oil Can", R. Haskell, February 27, 1922. See DX HA–01–28, Items 9, 12, 13.

25. Patent No. 2,873,052, "Paint Can Attachment", W. A. Atherton, February 10, 1969.

26. Patent No. 2,842,167, "Closure with Jigger-Type of Seal", E. S. Tupper, July 8, 1958.

27. Tupper discloses the full equivalent of the radial lip in that his "outer wall" (No. *15*) is designed to deform into a lip-like shape, thus attaining a seal with the outer can wall. See Tupper patent, DX HA–01–28, Exh. 16B, column 3, lines 31–42.

28. T. 376–9.

29. FunnelcaP's attempts to resist this result fall short of the mark. In addition to its contention that the prior art patents referred to are not within the relevant art—an argument considered in Section IA *supra*—it argues that the method of removing the Nowak device from a can—through finger pressure and without the need for tools and for pulling up on the flange area—renders the Nowak device novel. Coltman, Tupper and Atherton all require such manipulation of the flange area for removal, FunnelcaP points out, and the improvement in the Nowak device is not suggested in these references.

Even aside from the fact that a pressure-activated release of the flange lip is disclosed in another patent—namely, Patent No. 3,484,016, "Container and Closure", Lloyd S. Turner, December 16, 1969—FunnelcaP's argument is without merit. What is *claimed* in the Nowak patent is a *structure* and the fact that some feature of this structure might not have been obvious to one ordinarily skilled in the art has no bearing on whether the structure itself is obvious. *Cf. General Electric Company v. Jewel Incandescent Lamp Company*, 326 U.S. 242, 66 S.Ct. 81, 90 L.Ed. 43 (patent for certain pattern of frosting on inside of light bulb held invalid although surprising strength of frosted glass was achieved, where inside frosting of light bulbs and the frosting pattern in question were known processes).

## II. UNFAIR COMPETITION.

In addition to patent infringement, FunnelcaP charges Hollywood with having appropriated good will by passing off its funnel as a FunnelcaP product. FunnelcaP also claims that Hollywood has competed unfairly by selling to Western Auto at a price lower than it was then selling to other comparable customers.

### A. *The Alleged Appropriation Of Good Will.*

FunnelcaP asserts a number of different legal theories, all of which predicate liability on a wrongful appropriation of good will. One theory is based on the Uniform Deceptive Trade Practices Act (6 Del.C. §§ 2531–2536; Ch. 121½ Ill.Rev.Stat. §§ 311–317); the others are based on the common law of unfair competition.[30] I first turn to the relevant facts.

It is a fair inference that the designer of Hollywood's initial No. 22 funnel copied FunnelcaP's product. While Hollywood has since altered its product structurally by deleting the inner flange, it is still using FunnelcaP's idea and structural design, and is still making a profit as a result of that use.

Hollywood, however, has never marketed or advertised its funnel under the name "FunnelcaP" or "Funnel Cap", or any variation thereof.[31] Rather, the words featured on its labels are "No. 22 . SNAP–ON . OIL CAN FUNNEL" and "No. 21 . SNAP–TIGHT . ADDITIVE CAN FUNNEL". The name Hollywood Accessories is molded in the plastic of each funnel.

This type of product is marketed at the consumer level without packaging and with the label attached directly to the funnel wall. FunnelcaP's original funnels were made with yellow plastic, although it has since made a white plastic funnel as well.

Hollywood's funnels are also made with yellow plastic. The labels of the two parties, however, differ materially in color, size and shape. While both contain instructional text and drawings illustrative of the uses of the product, their layout makes the labels readily distinguishable by the consumer.

Hollywood's product catalogs list its funnels under captions like "# 22 SNAP–ON OIL CAN FUNNEL" and "# 21 HALF PINT, OFFSET FUNNEL". Each listing shows a picture of the funnel with its distinctive trade dress. Hollywood's listing in the programs of the 1974 and 1975 Auto Parts Accessory Association's trade show, however, contained a lengthy list of its products which includes the words "Funnel Cap". This suggests, FunnelcaP maintains, that these words are used by Hollywood in connection with the marketing of its competing funnels, a suggestion which is said to be supported by their use in a memorandum of Hollywood's Vice President to its sale representatives and in certain company correspondence with Western Auto.

I agree that Hollywood's immediate customers—e. g., jobbers and auto supply houses—have been exposed to the use of the words "Funnel Cap" in connection with Hollywood's efforts to sell its funnels (usually in phrases like the "No. 22 Funnel Cap" referring to Hollywood's product). At the same time, I do not attribute this to any deliberate design on Hollywood's part to usurp FunnelcaP's good will.[32] From the context, I believe use of this terminology results from the fact that the words "funnel cap" are a short and accurate way of describing the product itself.

The evidence relied upon by FunnelcaP to show actual confusion is less than persuasive. Mrs. Wyatt, FunnelcaP's Marketing Manager, testified that a representative

---

**30.** FunnelcaP has not registered a tradename or trademark under the Lanham Act.

**31.** There is evidence tending to show that Hollywood's funnels have been marketed by Western Auto in bins labelled "A 1085 FunnelcaP". There is no evidence, however, suggesting that the defendants in this case are responsible for that activity.

**32.** Hollywood's motive in copying plaintiff's funnel is obvious; it was a hot item and copying offered the promise of profit. On the other hand, it is hard to perceive a motive for one of the larger automobile supply houses, with an established line of products, going further and attempting to pass off its funnel as coming from another source.

of one of its customers, the Zeller Company, indicated to her that he thought FunnelcaP was supplying funnels to Hollywood. On cross-examination, however, she indicated that he might have said he thought Hollywood was manufacturing them under a license from FunnelcaP. The following additional testimony of Mrs. Wyatt is characteristic of the other "confusion" evidence in the record:

Q. Do you recall any other specific instances that would indicate there was confusion in the minds of buyers?

A. Well, yes. I remember another fellow from Illinois area that came to the booth and he stopped and he really looked and admired our product and he said, "You know, the funny thing happened. Last year a couple of people came in here and said they had a new product and he said I told them it wasn't new and I had received mailings on this. It had to be the last year or year and a half before that." So he knew that we were there first and had the product but to the marketplace they thought it was new from the other companies.

Q. Following the 1974 APAA Show did you have any other instances where there was some indication of confusion over the source of the FunnelcaP product?

A. Yes. I received another telephone call from a fellow who called and said I had seen your product being sold at Sears. I said, "I am sorry but ours wasn't sold at Sears and our product, it was a product very much like ours." "And I was reminded of it when I saw it because I received your literature about a year ago and we hadn't done anything on it" but it reminded him enough of it to call us up and he did order some.

\* \* \* \* \* \*

Q. Are you aware of any instances where anyone actually bought a Hollywood Accessory funnel thinking it was a funnel manufactured by FunnelcaP, Inc.?

A. I can't give you a name, a person I know personally, but it seems to me friends will come over and say that I saw your funnel being sold at Sears. And I mentioned earlier in the testimony that there was a call on the phone and a friend said this to me and now as far as them purchasing this funnel and saying it was made by Hollywood, no, they didn't go into the detail of the conversation. It was generalized enough that again I thought the content was there.[33]

To me this evidence suggests not so much that the public has been confused as to the source of Hollywood's funnels, as that some of the public is aware that a product which FunnelcaP initiated has been copied by others. Moreover, to the extent it can be taken as evidence of *source* confusion, it is entirely consistent with the view that the reason for any confusion is that the structural design of the funnel of Hollywood and five other manufacturers is substantially the same as the design of FunnelcaP's funnel. Mrs. Wyatt explained that there were two competing funnels at the 1973 APAA Show, Hollywood and Allison, and that there were four more by the 1975 Show. She then testified:

Q. Has FunnelcaP, Inc. examined or caused to be examined any other competitive funnel besides the Allison and the Hollywood Accessories' funnel?

A. I have seen some of them. Examine? Well, I looked at them and I looked quickly inside and I might snap one on if I have it, but *I don't have all of the funnels in the market that I consider are infringing and they look alike and I can't even—the difference which the average customer, I don't know how he determines it* and they try them to sample them, but back to your examining them, no, I haven't examined them carefully.[34]

Turning from the facts to legal analysis, in trademark terminology, the words "funnel cap" are descriptive. Mrs. Wyatt testified that they were chosen as the name for

**33.** T. 130–131; 146–147.

**34.** T. 158.

the product because its originators wanted to "emphasize" its two principal features— "it was a funnel and it was a cap, or a storage cover. . . ." [35] The record indicates more, however. It suggests to me that the words "funnel cap" became known in the marketplace as a generic term—that is, as a name for a class or type of product. Western Auto, as well as Hollywood, has used the words "funnel cap" or "Funnel Cap" in correspondence in a generic sense, not referring to plaintiff's product. And the same appears to be true of the public, as indicated in the following answers of Mrs. Wyatt:

Q. Are you aware the words "funnel" and "cap" being used in the trade to describe this type of product?

A. Funnel and cap like that, no. I call it a FunnelcaP other than funnel space cap as it was in the directory, I have seen it used that way under the Hollywood entry, but I am not aware of other people at my show and maybe I can explain it this way and see if this helps to explain it. *People will come up at the show and say it's a FunnelcaP[36] and I don't know if they are using it in one word or two words or whatever. It is the concept of what my product is to me and as I introduced it in the trade for two years at least.*

Q. *Have you had occasion where someone would come to your booth or other instances where they would refer to a competitor's similar product as a FunnelcaP, knowing that that was manufactured by a competitor?*

A. Yes.[37]

We may assume that the word "FunnelcaP" with capital letters at each end, is associated with a particular source in the minds of some in the market, although there is no direct evidence to this effect in the record. Even so, however, a fanciful contraction and letter style of this kind does not take away the descriptive or generic character of a mark so as to enable its owner to preclude others from using the words "funnel cap" without that contraction or letter style. *L. P. Larson, Jr. Co. v. Lamont, Corliss & Co.,* 257 F. 270 (7th Cir. 1919); 1 *McCarthy, Trademark and Unfair Competition,* §§ 11.11, 11.12, 12.1, 12.2, 12.14 (1973). This is the most that Hollywood has done. There is no evidence in this record that Hollywood has been responsible for the use of the mark "FunnelcaP" in connection with the sale of its funnel.

Turning from trademark law to more general principles of unfair competition, the question remains whether the totality of Hollywood's activities in the market has created a likelihood of confusion and, if so, whether this circumstance constitutes unfair competition. As previously noted, I find no persuasive evidence in this record of anyone purchasing a Hollywood funnel in the belief that he or she was getting a FunnelcaP funnel. It is fair to assume, however, that there will be some confusion in any market having a number of funnels of the same structural design. But this confusion is the result of product copying, not trademark or trade dress copying,[38] and, accordingly, cannot provide the basis for either legal or equitable relief. As the Supreme Court observed in a landmark

---

35. T. 137.

36. Except where otherwise expressly indicated, the witnesses gave the reporters no express instructions with respect to the spelling of the words "funnel cap" or their derivatives.

37. T. 139–140 (emphasis supplied).

38. FunnelcaP asserts that Hollywood also copied its product color. There are two answers to this argument. First, color, other than as an integral part of a distinctive trade dress, cannot be appropriated by one producer in a field. *E. g., Campbell Soup Co. v. Armour & Co.,* 175 F.2d 795 (3rd Cir. 1949); *Schmidt Manufacturing Co. of S. C. v. Sherrill Industries, Inc.,* 249 F.Supp. 480 (W.D.N.C.1965); 1 *McCarthy, Trademark and Unfair Competition,* §§ 7.16, 7.17 (1973). Second, to the extent there was any association in the market between FunnelcaP and its product, the association was with the product design and not the color. Accordingly, I do not believe any confusion exists in the market because of Hollywood's use of yellow plastic which would not exist in any event because of Hollywood's copying of FunnelcaP's funnel structure.

case involving the copying by Sears, Roebuck of a "pole lamp" designed and sold by Stiffel:

. . . An unpatentable article, like an article on which the patent has expired, is in the public domain and may be sold by whoever chooses to do so. What Sears did was to copy Stiffel's design and to sell lamps almost identical to those sold by Stiffel. This it had every right to do under the federal patent laws. That Stiffel originated the pole lamp and made it popular is immaterial. "Sharing in the goodwill of an article unprotected by patent or trade-mark is the exercise of a right possessed by all—and in the free exercise of which the consuming public is deeply interested." *Kellogg Co. v. National Biscuit Co.,* supra, 305 U.S. [111] at 122 [59 S.Ct. 109, at 115, 83 L.Ed. 73]. To allow a State by use of its law of unfair competition to prevent the copying of an article which represents too slight an advance to be patented would be to permit the State to block off from the public something which federal law has said belongs to the public. . . .

Sears has been held liable here for unfair competition because of a finding of likelihood of confusion based only on the fact that Sears' lamp was copied from Stiffel's unpatented lamp and that consequently the two looked exactly alike. Of course there could be "confusion" as to who had manufactured these nearly identical articles. But mere inability of the public to tell two identical articles apart is not enough to support an injunction against copying or an award of damages for copying that which the federal patent laws permit to be copied. . . .

*Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 231–32, 84 S.Ct. 784, 789, 11 L.Ed.2d 661 (1964).

For the same reasons, there can be no liability here based on market confusion whether that liability is sought to be predicated on a state deceptive practices statute

or on state common law of unfair competition.[39]

### B. *The Alleged Unfair Competition In Pricing.*

FunnelcaP's price to Western Auto in 1972–73 was $7.20 per case of 48 funnels or $.15 each. This was the same price Hollywood announced for its No. 22 funnel on July 27, 1973. Hollywood thereafter reduced its price to an effective rate of $.10 in an effort to get Western's business. This price was lower than Hollywood was then charging to two other mass merchandisers, K–Mart and J. C. Penney. There is no suggestion that the $.10 price was below cost.

 FunnelcaP has not referred the Court to any state statute or common law authority which would impose liability on these facts alone. They do not appear to present a case of common law unfair competition. 2 *Nimes, Unfair Competition* (4 ed. 1947) § 300. FunnelcaP implicitly concedes this by addressing virtually all of its post-trial briefing on this point to the Robinson-Patman Act. In the long history of this case, this was the first suggestion of any kind that plaintiff intended to rely on this federal statute and the pre-trial order is inconsistent with any such reliance. In fairness to the defendants, who had no reason to mount a defense of a Robinson-Patman claim, the Court refuses to entertain this claim.

FunnelcaP concedes, as it must, that its second amended complaint nowhere mentions the Robinson-Patman Act and, indeed, nowhere refers to price discrimination. FunnelcaP, however, points out that the revised pre-trial order, which governs this case, contains the following provision:

XII. *Amendments Of The Pleadings.*

At the pre-trial conference the Court's attention was directed to the following matters which were resolved by agreement of counsel and are now incorporated

---

**39.** The portion of the Uniform Deceptive Trade Practices Act relied upon by FunnelcaP is a codification of the common law of unfair competition and need not be separately discussed.

in this Order so that they do not require formal amendments of the pleadings:

\* \* \* \* \* \*

D. FunnelcaP, Inc.'s alleged causes of action for deceptive trade practices and unfair competition should be broadly construed to encompass such proof of discriminatory pricing by Hollywood Accessories as [may be] presented and admitted in evidence at trial and, if necessary, FunnelcaP, Inc. will be granted leave to amend its complaint in order to conform the pleadings to the proofs.

Given this provision, FunnelcaP argues that it is entitled to have its Robinson-Patman Act claim decided as an "issue not raised by the pleadings [but] tried by express or complied consent of the parties . . .." F.R.C.P. 15(b). I do not agree.

As a leading authority on Federal Practice has pointed out, recognition that an issue has been inserted in a case and consent to try that issue are fundamental prerequisites to any post-trial amendment of the pleadings. 3 *Moore's Federal Practice,* ¶ 15.13[2], at 922 (1974). In the present case, given the portion of the pre-trial order cited above and defendants' failure to make any objection to the general line of price discrimination questioning at trial, it cannot be doubted that defendants consented to the *presentation of price discrimination evidence* in support of FunnelcaP's deceptive trade practice or unfair competition theories. I do not think it can be fairly said that defendants ever consented to the presentation of this evidence on a Robinson-Patman Act theory, however.

As can be seen, the portion of the pre-trial order quoted above pegs FunnelcaP's price discrimination evidence to its pleaded causes of action for deceptive trade practices and unfair competition. Respecting these causes of action, the second amended complaint states as follows:

12. Plaintiff's second cause of action is for unfair competition and deceptive trade practices and arises under the Uniform Deceptive Trade Practices Act of the State of Illinois, Chapter 121½ Ill. Rev.Stat. §§ 311–317 and the State of Delaware, Title 6 Del.C. §§ 2531–2536.

. . .

\* \* \* \* \* \*

23. Plaintiff's third cause of action *arises under the common laws* pertaining to unfair competition. . . .

In the pre-trial order itself, FunnelcaP explained that the Court had jurisdiction of the non-patent claims by virtue of its pendent and diversity jurisdictions. And, in the section of this order where each party is required to set forth the issues of law which it believes remain to be litigated,[40] FunnelcaP makes no reference whatever to the Robinson-Patman Act. Local Rule 11 and the pre-trial order itself provide that the pre-trial order shall "govern the course of [the] trial unless modified by the Court to prevent manifest injustice." In this case, it would create a manifest injustice to permit the insertion at this stage of a legal theory not found in the pre-trial order.

In discussing a comparable situation, the Eighth Circuit has stated:

The proffered amendment set forth a completely new cause of action, based on a wholly different theory from that alleged in the amended complaint. The fact that the evidence submitted and received at the trial, on the then-existing issue raised by the answer and reply, would have been relevant and admissible in the trial of such new cause of action does not mean that the latter was tried by the express or implied consent of the appellee. . . .

*Standard Title Insurance Company v. Roberts,* 349 F.2d 613, 620 (1965). See also 3 *Moore's Federal Practice* ¶ 15.13[2], at 991–92 (1974).

### III. ATTORNEYS' FEES.

#### A. *Defendants' Claim.*

Defendants assert that this is an "exceptional case" within the meaning of 35 U.S.C. § 285 and that they should be award-

40. Local Rule 11.

ed counsel fees. I disagree. Contrary to defendants' contention, I am not persuaded that Mr. Nowak knew of the Tupper patent or of its preferred embodiment when his own patent was before the Patent Office and I do not believe the record before me demonstrates fraud on that office. In addition, I conclude that FunnelcaP has litigated the patent infringement segment of this case in the good faith, although erroneous, belief that both Hollywood's funnels infringed the patent-in-suit.

### B. *Plaintiff's Claim.*

 Plaintiff's claim for counsel fees will likewise be denied. As my earlier conclusions would suggest, I believe defendants have defended this action in good faith.

41. See this Court's prior Opinions of April 10, 1975 and July 7, 1975.

42. Plaintiff maintains that the affidavits were calculated to secure a litigation advantage with respect to the issue of forum. The problem with this theory is that the advantage of having the "first-filed suit" in which Cal Custom was a

While some of the affidavits filed by Orion in the early stages of the Delaware action are troubling in a number of respects,[41] I am unpersuaded that the portions complained of have caused plaintiff to incur any legal expense that it would not otherwise have incurred.[42]

### IV. CONCLUSION.

The patent-in-suit, if valid, would be infringed by Hollywood's original funnel, though not by its revised product. The patent-in-suit, however, is anticipated by the prior art, and, even if not anticipated, would be obvious from that art. Defendants are not guilty of unfair competition. Both claims for counsel fees are denied.

Submit order.

Appendix to follow.

party filed in California was secured on December 5, 1974, seven days before the first of these affidavits were filed in Delaware. In any event, I am not persuaded that anything happened either in California or Delaware which would not have happened in the absence of the challenged segments of these affidavits.

APPENDIX

FIGURE 1

FIGURE 2

FIGURE 3

FIGURE 4

FIGURE 5